Good morning, Your Honor. Patrick McGuire on behalf of the appellant, Dr. Fred Geisler. I would like to retain about three minutes for rebuttal. Judge, this is an insurance coverage matter that stems from two underlying lawsuits alleging medical malpractice. Policy at issue was that claims made coverage that was issued to a practice group that had employed my client, the doctor, as a neurosurgeon. The case comes before you because the circuit court denied my client's motion for partial summary judgment as to liability with regard to the La La Cata lawsuit, and also the circuit court granted the insurance company and the third party administrators' motions for summary judgment as to all other issues. The underlying cases raised two different types of insurance coverage issues. I'd like to start by addressing the La La Cata coverage issues. The threshold issue there and the errors at the trial court provide this court with two main avenues to reverse the trial court and find that there was coverage for Dr. Geisler. The first is under the traditional duty to defend analysis. I'm cognizant of the fact that the policy has a provision that says the insurance company had the right but not the obligation to provide a defense. However, the specific policy language at issue here, which is in Section 4A of the policy, so the insurance company relied on Section 4A or Section 4 in total to say that there was no defense obligation. Mr. McGuire, let me interrupt you just so I can clear up a couple of factual issues because it isn't a question of law as much. There are also factual issues that were asserted that might impinge upon our decision. And that concerned two matters. First, your client was ultimately non-suitable in the La La Cotto, true? Correct. And you are seeking reimbursement for defense costs, correct? Correct. The assertion is in the insurance company's brief that Dr. Geisler never submitted a statement for defense costs. So how does that issue become ripe for determination? Isn't it waiver, forfeiture, abandonment? Dr. Geisler never asked for reimbursement of defense costs. How does that insurance company respond? Well, I think, I don't believe it was waiver because I believe that, but how does an insurance company respond in the absence of a demand by its purported insurer that you owe me this money? And they never get that. Well, we waited until after the lawsuit, the underlying lawsuit was resolved. And then at that point, we knew what the damages had been from what he had spent to pay for his own defense attorney in the underlying lawsuit. So we didn't actually know what the damages were going to be until they were resolved. So are you saying that at some point down the line, such a demand was made by Dr. Geisler against the insurance company for reimbursement? Yes, certainly in the form of the complaint. And also I think the other. Certainly in the form of the complaint. He's not answering the question yet. I'm sorry. I think I interrupted. I didn't listen to it all. So in the form of a complaint. So what you're saying is that your client never submitted bills to the insurance company? Well, we, I think. Now that's an easy one. Were the bills submitted to the insurance company prior to you filing the complaint? No. Then the other question is, wasn't there some sort of minimum expenditure that had to be satisfied before, you know, defense costs would be subject to reimbursement? Yes. And let me correct one thing, if I would, may, before I address that question. Throughout that period, between the time that we were named in the La La Cotta lawsuit, we also had an arbitration pending that was seeking terminations as to what this policy did cover and didn't cover, and we had made a claim there against CINN for the potential coverage. So I think that given their agency relationship with the insurance company, they certainly, you know, the fact that we had incurred bills and were continuing to incur bills was known both to CINN as the agent and then also to the insurance company. But you didn't proceed ahead with that arbitration? Pardon me? You did not proceed ahead with the arbitration? Yes. The arbitration went full Monty. It lasted for several years. And ultimately, in the arbitration that was instituted by CINN against Dr. Geisler, ultimately resulted in an award by Judge Neville, the Honorable Judge Richard Neville. And that wasn't until the final award, I believe, was in 2011. Yeah, but that's not part of the record of this case. Only to the extent that the interim award was made part of the record, where the insurance issues for La La Cata were dealt with. And they were the focal point of the arbitration that was in front of Judge Neville. I went through the record of this case. I saw nothing about the arbitration except that there was an order for arbitration, and I saw nothing other than that. I believe in the Appellee's Appendix they attached or included the interim award for the arbitration. And that's part of the record of this case? Yes. I'll have to take a look again. Back to your question, Justice Garcia. The issue is the extinguished exhaustion of the self-insured retention. I believe that does play in specifically to Section 4A of the policy. Because under Section 4A it says that defense costs are, in fact, included as coverage. You know, they're included for coverage in addition to any indemnity. Therefore, this is not like a policy that says, under no circumstances will defense costs be paid. To the contrary, it says defense costs will be paid even in those instances where the insurance company chooses not to involve itself in the defense, but you have to wait until the self-insured retention is exhausted. So the defense costs would have to, I don't know how it reaches 2.5 million or whatever the figure was, in a pro rata basis. I assume each doctor doesn't have to spend that much money individually. Correct. It's the practice. It's the named insured. Correct. The aggregate for any indemnity or claims expenses that were paid once they reached 2.5 million. So you, Dr. Geisler, concedes that that is applicable to his claim, but implicit is his contention that it was satisfied? Yes. Two points on that. Sure. First one being that because there is no way to tell from the face of the policy whether the self-insured retention had been exhausted at any point, I think under the traditional duty to defend analysis, where you're limited to the four corners of the complaint and the four corners of the policy, that necessarily takes into account outside information as to what the self-insured retention is at any point. And I'll get to that as far as the full duty to defend analysis. The second point, however, is just under a straight indemnity analysis, that Section 4A states that we will pay, the company will pay, defense costs incurred by an insured once that self-insured retention is, in fact, exhausted. And the record in this case is that the self-insured retention was exhausted in December of 2008. So even putting aside the... Let me clarify one other question, if I can. There's no dispute that Dr. Geisler was a covered insured for the La La Cata lawsuit, is there? I don't believe there should have been, but there was made a dispute because the trial court and the insurance company took the position that he had been removed from That wasn't... I didn't think that was for the La La Cata lawsuit. That was for the La La Cata. I don't that they are not in dispute. Townsley, there was no issue as to coverage. La La Cata, there was an issue as to coverage. And at Townsley, he was paid all of his attorney's fees, defense costs. He was ultimately paid the defense costs that were incurred, yes. So you don't have any real claim on Townsley, do you? Well, I think we have, under a totality of circumstances, there are two issues with regard to Townsley. Number one was the insurance company and or the third-party administrator and or CINN, but primarily the insurance company, waited 18 months to pay the Hickey Melia, the defense firm, for its defense fees as they were being incurred, which caused Hickey Melia to contact my client and say, listen, we're not getting paid. We are going to withdraw from representing you in this medical malpractice case. So it really strained that attorney-client relationship and there is no basis for it. Is there a cause of action for a strain of the attorney-client relationship? If there's a case, I'd like to know about that. I don't have a case that I can point you to. But I think, again, under the totality of the circumstances, there has to be some justification why they waited 18 months to pay these, as Justice Garcia said, indisputably covered defense costs that were incurred in Townsley. And then the second aspect. But where's the damage? It was paid. Right. He did incur some attorney's fees for myself primarily in trying to get the insurance company to respond to our requests. Is that part of the record of this case? Yes, it is. And how much was that? It was a few thousand dollars. Is that in your brief, $2,000 damage? No, I think it was $2,000. I believe it. That was certainly what we alleged was. I mean, you allege that it's a violation of the statute and that because of an unreasonable delay under that statute. But you didn't show any damages. And that was one of the points that we tried to clarify when we asked for leave to file a second amended complaint. We tried to address that trial court's perceived deficiency with the complaint to add those allegations as to what Dr. Geisler had incurred for defense costs or for attorney's fees trying to get answers to the question of why aren't these legitimate defense bills getting paid in a timely manner. So that was one of the purposes of our second amended complaint. I had one question, and it's just because I can't remember. When was the exhaustion of the fund in relation to the time when the Townsley fees were paid? I mean, how much longer after the exhaustion occurred was Townsley paid completely? I think the exhaustion was in December of 2008, and some fees to Hickey Melia I think were paid within a few weeks thereafter, and then I believe that they were paid completely in about June of 2009, so six to seven months after the exhaustion. Do you think it was a violation for the insurance company to wait until Was that vexatious and unreasonable to wait until the SIR was satisfied? Well, I think under what they – and one of the issues here I think was Dr. Geisler and his attorneys had no idea what was going on behind the scenes of this policy and the relationship between the practice group. But once you find out that that's what's going on, how does that make it unreasonable? Or how does that impinge upon your claim of unreasonable delay? I think that the fact that CINN, the practice group, and the insurance company were – this policy was supposed to be a fully funded self-insured retention. The money was supposed to have been paid to the insurance company to begin with. They should have had the money all along. So the 2.5 should have been in there already. It should have been in there already, and there shouldn't have been this type of delay to allow this. So, again, I think under the traditional duty to defend analysis, there should have been deemed an estoppel. On March 29th of 2004, when the insurance company received the written notice from the practice group as to allow the CADA claim, I think all under the duty to defend analysis, that set the time when the insurance company had the obligation to examine the four corners of the complaint against the four corners of the policy. At that time, it is undisputed that the endorsement 12, which purported to retroactively terminate coverage effective to December 31st of 2003, was not part of the policy. So what we have here is a situation where all of the conditions preceding to coverage were in place. When the insurance company received that claim of LALA CADA in March of 2004, had it done what it was supposed to do under the well-studied case, well-studied case like Outdoor Marine, so on and so forth, Supreme Court cases, should have done the policy analysis, figured out that there was a potential for coverage, including first dollar defense cost based on whether, where that self-insured retention was in terms of exhaustion. So it gave the potentiality for coverage at that point. So then moving along, that triggered the insurance company's obligation to file a declaratory judgment action and get any and all of the policy defenses that it raised in the trial court below resolved. Let me ask you this question regarding the difference between the insurance company and the management, third-party administrator. Because I think what you just said is that the insurance company doesn't have a duty to reimburse until, at the earliest, December 15, 2008. Because until then, the funds hadn't been exhausted and the insurance company doesn't have to do anything. So why isn't that, why doesn't that, and then it renders, then it transforms the delay from 18 months into 6 months, because we're talking a full payment by June of 2009. Why doesn't that decide the reasonableness? It's facts of record, you are correct. They did, I think, once it was exhausted, they did pay it in relatively short fashion. You're right, the 18-month delay did precede a part of that. But again, the insurance company allowed the practice group to get so far behind on its payments that it wasn't funded. There should have been no reason under this policy there should have been any delay. Well, here's an issue that you're missing. When there's an SIR and there's many cases pending and many lawyers sending in bills, there's no way to determine on a daily basis what the balance of an SIR is. I mean, that's known in the insurance industry for generations and generations. Retention cannot be determined until pending cases are over. And I agree, Judge, but I also think, then, they had an obligation to go into court under a declaratory judgment action during the pendency of that la la cotta suit and say to the court, this is the issue. We've got a self-insured retention out there that's not yet exhausted. But they had a public company doing the adjusting, and the public company is keeping the records on all these things. The insurance company doesn't even get to know about it until the SIR is exhausted. You know, it's a process that takes a long time, and it's a process that's been in the industry for generations, as I've said. And part of the record is the letters that I sent on behalf of Dr. Geisler to the third-party administrator long before, several months before we filed suit, saying, can you just give me a sense of what is left on this self-insured retention? Well, how can they give you a sense when they wouldn't have a clue? But even a ballpark. Even a ballpark. I mean, how do you do that? I mean, think about it. If you were administering an insurance company and you had 20, 30 cases going at the same time, and every month the lawyers are sending in their bills, you know, it's an impossibility to be able to make that determination on short notice. I think respectfully, then, it should have been brought as part of a declaratory judgment to say this is the issue, this is why we can't determine this right now and bring in all of these other what they later raised as policy defenses several years later. You know, I think the case law is clear. They are protected if they do that. What you're asking us to do is to write a decision and change the entire manner in which insurance companies do business. I think the opposite. I think I'm asking that this Court hold true to the longstanding precedent about the duty to defend analysis and find that if there is a question as to the applicability of policy defenses, whether it be the exhaustion of the self-insured retention, whether it be the application of an endorsement dated in September of 2004 that purported to terminate coverage back to December of 2003. Yeah, but this was a claims-made policy, and a claims-made policy, if the man is terminated from his employment, there's no policy no more. That's not how this policy was written, and I think the... All claims-made policies are written the same way. But they had a tail. They have to be approved by the director of the Department of Insurance. They have a criteria for it, and that's the criteria. If you look in the insurance code, you'll find it. But the way this policy was written was to say that coverage could be provided for physicians after their termination from employment. And, in fact, they've conceded that. The insurance company has conceded that in its briefs, because you can get tail coverage for somebody who has retired or who has been terminated. There's no question you could get it, but it wasn't here in this case. But here, the facts of record were that in December of 2003, the practice group exercised an unlimited period, extended reporting period endorsement that covered all of the physicians that were on the policy on endorsement one, going back to policy inception. Dr. Geisler was part of that schedule of medical insureds. But he wasn't terminated at that point. He was terminated in December of 2003 right at the same time that they exercised this extended reporting period option. But then in March of 2004, so about four months later, they got a written notice from the general counsel for the practice group that a claim had been made. At that point, the policy on its face still reflected that Dr. Geisler was a medical insured. But Dr. Geisler was given a notice, wasn't he, that he was terminated and there would be no more insurance? He was provided those types of letters, but under Condition K of the policy, no agreements as to anything involving coverage that was not incorporated into the policy was effective. And that makes perfect sense because the insurance companies will use that provision to their benefit all the time, to say we're not going to have insureds come in and say we had some oral agreement with the agent or somebody else. Once he was terminated, did he write a letter to the insurance company and say, you know, I would like to have my coverage extended and I will pay the premiums? Did he say that? Judge, no. There's no letter that was sent. I mean, isn't that the way you do it? Well, the issue was that Dr. Geisler was not made aware of all of these things while this was going on. Most of what is happening here is being looked at with the benefit of hindsight, but when he was terminated, you know, he originally received a letter from his broker saying that he was included on that policy. Then he received a letter saying that he wasn't included on that policy. And then he tried to get insurance, but to try to, as a neurosurgeon, to try to get single-person coverage in Cook County at that time, you know, was very difficult, if not impossible. So, again, I think, you know, there are two routes to finding coverage for la licata. The duty to defend analysis doesn't require this court to stray from any of that long-standing precedent, and it is, I think, a reasonable decision. Secondly, on a simple indemnity, they've admitted that the policy, the SIR was exhausted in December of 2008, and then under Section 4A, they should just now reimburse him. And that should be the insurance company because there's no question that CIN and the practice group exhausted its self-insured retention by that time. Thank you. Thank you. Thank you. I'm going to be saying good afternoon, counsel. Good afternoon. May it please the Court. My name is Ross Roloff, and I represent the defendants, Everest National Insurance Company and Western Litigation Incorporated. If the Court will indulge me, I'll refer to them collectively as Everest, unless specified otherwise. I'd like to briefly touch upon an issue that was not raised, and that is jurisdiction. Everest believes that this Court is without jurisdiction to hear this appeal, and the plaintiff has not addressed the jurisdiction issue. And here, we've read the brief, as Justice Gordon always points out, and so we're familiar with your contention. Let me ask you, point blank, what was missing from the motion? What was missing from the motion was a challenge to the August 25, 2010 judgment. Didn't it seek to vacate? It sought to file an amended complaint. Well, that was one of several requests, no? The title of the motion is a motion to reconsider. In the prayer for relief, one of the things the plaintiff prayed for was vacating the judgment. But the case law is clear that you don't look to the title of a motion, and I would submit that it follows that you don't look to the prayer for relief, but you look for what is set forth in the motion. And what is set forth in the motion is requesting to amend the complaint. Well, here's the difficulty I have. A motion for a new trial shouldn't be what might be referred to as a critical stage of the proceedings. It should be fairly pro forma. And if a motion says we want you to vacate your decision, let's go on to the merits of the issues. In the Court of Appeals, an appellate court, we're not going to get into the micro-examination of a motion to determine whether or not it really qualifies as something to toll. That's a good idea. I agree with Justice Garcia. Should we? No, should we? Should we do that? Should we consider it a critical stage and so that we have to examine everything that's on the motion to determine whether or not it truly is a post-trial motion? I think you should. And what would be the reasoning behind that? The reasoning behind that would be Would it prevent you from having addressed all the issues? And didn't you, you know, would it reduce the amount of work you have to do in the course of the appeal? No, I don't think so. Because in fact In fact, yeah. And would you like to see a motion Would you like to see an opinion saying that we're not going to look at the title and we're not going to look at the prayer and unless you make an allegation in the body, we're not going to treat it as a post-trial motion? Would you like to see something like that? There are opinions that say that. There are opinions that say that. And there are opinions that are very closely on point. The Marsh opinion and the Shutkus opinion cited in our brief are both cases that stand for the proposition that a motion to amend pleadings is not a proper post-trial motion that holds the 30 days under Rule 303. So what happens in a situation where a party wants to do wants to attack the judgment of the court on various prongs, on various means? It wants to tell the judge, Judge, you got it wrong because we can amend our complaint and avoid this consequence. Or we can vacate You should vacate because you got it wrong outright. Why should a motion to amend all of a sudden be treated as if it really isn't challenging the outcome? I think the distinction is that a motion, a proper post-trial motion attacks the judgment or seeks to challenge the judgment in some way. You see, that's what good lawyers do. But not everybody is necessarily a good lawyer. But when they have the words to vacate we have to look at that too. And when it says to vacate then it comes into the area of a post-trial motion. My response to that would simply be that the Shutka's opinion says that you don't look to the title of a motion. I'm not talking about the title. We're talking about the prayer for relief. Well, I would submit that it follows that you also don't simply look at the prayer for relief. You actually have to look at what's in the substance of the motion. So to that extent you are asking us to extend the law a little further. You want the prayer for relief thrown in with the title for a motion as being inconsequential. So I ask you whether or not it qualifies as a post-trial motion. I think your better arguments before us should be on the merits of the case. Why don't we go there? In that case I will move on to the merits. There's three undisputed facts that cannot be understated here. First, Everest has no duty to defend. They have the right to defend but they do not have the duty to defend. Second, the SIR was not exhausted until December 15, 2008. And the import of that is that Everest had no contractual obligation until that time. Let me briefly interrupt you and go back to the first point. Yes. A right to defend but not a duty to defend. Correct. Does that wipe away the analysis that the doctor is asking us to engage in on the duty to defend? I believe it does. The contract is the contract, right? The contract is the contract. I think all of the cases... But it's not subject to that duty to defend analysis that exists in so many cases. I completely agree. All of the doctrines such as estoppel and actual notice, things that you would distill from the long line of cases concerning the duty to defend, all of those cases are cases where the policy has a duty to defend. Third, and finally, and maybe most significantly, is that even if Everest loses on all of the coverage issues raised in this matter, there are no damages. And let me turn to the specifics that the panel has raised about the chronology and what's in the record. There is nothing in the record as to Lalicata showing any defense costs, invoices submitted by the plaintiff. How about in the amended complaint? Was there going to be... Did you get to see the amended complaint? The amended complaint attempts to... Actually, the amended complaint sets forth allegations of damages concerning attorney's fees in both cases. But none of that evidence is new evidence. All of that evidence was evidence that was available to the plaintiff at the initial stage of the summary judgment process. And the plaintiff never set forth any information. There were no affidavits submitted. The only evidence in the record concerning sort of the accounting of attorney's fees and costs is the affidavit of Western's claim person, which was part of the summary judgment briefing, setting forth that as to Lalicata, the plaintiff never submitted any defense cost invoices. And as to Townsley, when the SIR was exhausted on December 15, 2008, a balance of outstanding defense costs was paid, I believe, within two weeks. And the matter was settled. Indemnity costs were paid. And then the balance of defense costs was paid upon the request of Everest for those outstanding invoices in order to wrap the thing up. That was paid in June. And so I'd like to dispel the notion that even after the SIR was exhausted, that there was any delay in payment. Payment was made promptly upon the invoices being provided to the insurance company. With respect to Townsley. Let me ask you this regarding Lalicata and the defense. Is there a case out there that approves of a claim of unreasonableness in the absence of a demand for payment of defense expenses? Or really what I mean to say is can the issue of reasonableness be first raised in the complaint itself, absence, any prior demand for payment? Is there a case out there that... I'm not aware of any cases that address demand for payment. The cases cited in our brief, the McGee case and the Caligano case, are both cases that sort of touch upon the issue of there needing to be some measure of damages before you can set forth a claim under Section 155. Both of those cases involved instances where insurance companies refused to pay a claim and they sort of both involved extended processes of investigation. And finally, only after the bad faith claim was filed and the damages were paid the issue in those cases involved whether it's okay for an insurance company to pay those costs in order to avoid the bad faith claim. It's different here because there were never any damages to begin with. And was there ever a refusal to pay by the insurance company? No, there was never a refusal to pay. How do we get into vexatious delay when there's been no refusal? I don't think we do. I don't think we ever get there. I think that certainly most of the bad faith cases talk about the need for there to be a bona fide dispute before you even meet the threshold of asserting a bad faith claim. I don't believe that these disputes were bona fide and so I hesitate to call them bona fide disputes. But there certainly was a dispute, there certainly was an issue I suppose as to who was obligated to pay costs at what time. I would suggest that until the SIR was exhausted it was not Everest's obligation to pay anything. They had no contractual obligation to the doctor to anyone in these claims or any other claims until that SIR was exhausted. And when the SIR was exhausted the record reflects that the costs were paid within two weeks. And it's not as if Everest treated Dr. Geisler differently than the other insurance under the policy in terms of payment of defense costs? There certainly isn't any evidence of that in the record. So I guess I would say no. How about the arbitration? Is that part of the record? When Your Honor asked that question I was trying to remember what's in the record and I believe the counsel is correct that what is in the record is the arbitration decision and that was included in the record in our summary judgment briefing for the purposes of further demonstrating that as of January 1, 2004 the plaintiff knew that he was without coverage under the Everest policy because the arbitration decision itself is one of the multiple pieces of evidence that shows that that's the case. The arbitrator stated in his decision that the plaintiff was without claims made coverage after January 1, 2004 under this policy and he was obligated to go out and get his own coverage. I believe that's the only part of the arbitration proceeding that is part of the record. Is that binding arbitration? I believe it was. Does it have any effect on this case? I don't think it has any effect on this case at all. The only possible effect that it could have, well I hesitate to even say this, the practice was originally a party to this litigation. They were dismissed from this litigation so that the arbitration could be done. Certainly as to the defense cost payment and whose obligation it was to pay those defense costs I think it was the practice's obligation to pay the costs up until the point the S.A.R. was exhausted. And so in answer to your question the only way the arbitration could have any impact on this is whether the plaintiff would in the future be able to state a cause of action against the party that probably that was obligated to pay the defense costs prior to the S.I.R. exhaustion. With respect to Lalicata I would like to refer the Court to the record, page C00774 to simply address the issue that was raised concerning the doctor's knowledge of being taken off the policy. The documents there in the record reflect that the doctor was notified by telephone the doctor was notified by facsimile and by email that he was no longer covered under the policy effective January 1st, 2004. There was a statement made during the plaintiff's argument that he had received information to the contrary and as you will see at page 774 there is a reference to that and what that says is we're sorry the certificate that was issued to you is not valid you don't have coverage effective January 1st, 2004. The reason that the doctor didn't have coverage is that he was removed from the policy as a medical insured and the claims made provision in conjunction with the definition of medical insured require that a physician be a medical insured endorsed to the policy both at the time the claim is made and at the time of the loss event and here we may have one we don't have the other. There was no request to extend coverage for him. Not that I'm aware of. It's certainly not in the record. I'm going to ask you to wind up in a couple of minutes Thank you. I would simply conclude by returning to the motion that was probably properly before the trial court. The motion to amend the pleadings. After summary judgment the case law is clear that such a motion is held to a higher standard than amending pleadings in other instances. It's held to a standard that's akin to a motion for reconsideration. It requires either new evidence changes in the law or errors in application. There was no new evidence here. Anything that was attempted to be proffered could have been offered the first time around and so Everest believes that the trial court properly denied the motion. Unless there are any other questions Everest and Western respectfully request that this court either dismiss the plaintiff's appeal for lack of jurisdiction or affirm the trial court's July 13th denial of the plaintiff's motion for summary judgment as to La La Cata affirm its August 25th, 2010 judgment in favor of the defendants as to both La La Cata and Townsley and affirm the November 30th, 2010 denial of the plaintiff's post-trial motion. Thank you. Thank you. First of all I'd like to address the jurisdictional issue just real quickly. At the outset of this case they filed a motion to dismiss. That was denied. With regard to the facts that counsel relied on stating that there is no duty to defend again I would cite you to look at 4A carefully. I think it does distinguish this from other types of cases and I think the traditional duty to defend analysis does apply. Briefly with regard to the arbitration the practice group actually initiated that arbitration and sought to have Dr. Geisler cover all of its defense costs and indemnify it for any La La Cata lawsuit. I think that's important because it was made abundantly clear to Dr. Geisler that Everest was not going to pay or defend it and in fact the other insured was trying to get Dr. Geisler to have to pay its fees and I think the law does not require people to do useless things and for lawyers to do useless things. To submit a demand for payment knowing that we're getting sued by them to try to have it the other way and have my client incur all of those costs. I think as far as this matter did come up on summary judgment it was flat that we had incurred $118,000 worth of attorney's fees. There's certainly nothing to counteract or to meet the defendant's burdens of proof to say that that wasn't true. So I think it stood as part of the record that we had in fact incurred those damages. So I think based on the summary judgment standard that was sufficient and should not give this court any pauses to find that there were no damages pled. Ultimately I think the coverage analysis comes down to... But are you saying your bill for attorney's fees was in the record on the motion for summary judgment? I'm saying that it was pled as to the $118,000 that were incurred by the Hick Emelia firm as defense of the lollipop. They were paid. They were ultimately paid. Talking about your claim you say you had to do something to get them to pay it and was that part of the motion for summary judgment? Well, just to be clear, Dr. Geisler paid Hick Emelia the $118,000 himself. That was not paid by the insurance company at any time. That's because they declined coverage and said we're not going to provide you with any type of coverage. That's what this lawsuit was about is to say that there was coverage here and they should have reimbursed him for that $118,000 that he is actually out of pocket. And in fact because the arbitration came down my client actually had to pay some of CINN's defense costs that were incurred in the lollipop that were supposedly covered under this policy. So that is our breach of contract claim. There were damages pled. We're seeking reimbursement for those under this policy. And I think the only way that for the analysis that... But under that lawsuit he wasn't covered anymore? Lollipop they took the position that he was not covered at all from the outset. They gave him notice. It's undisputed. He didn't ask for any extension. He was included on the extended reported period endorsement that was purchased in December of 2003 for a set amount for $476,000. And then he was removed from that? In September of 2004 five months after the lawsuit. My position on that is I think we're looking at the mirror image of the well-known known loss doctrine. If it is improper for an insured to try to seek coverage for a known loss because insurance shouldn't be available for it. I think the flip side is true as well that an insurance company and its self-insured entity that had a 2.5 million self-insured retention should not be able after they've received notice of this claim that falls squarely within the policy as it was constituted on the day they received the notice should not be allowed to then several months later by changing dates on the piece of paper, the effective dates cancel coverage all the way retroactive to his last name. Your argument would be good except on the day that he was terminated they gave him notice there wasn't any coverage. If they would not have done that then you'd have a very good argument. But I think that under the duty to defend actually under any coverage analysis those documents that they gave them, those conversations that they said they had, those cannot be they're not in front of the court, they're not part of the policy to determine whether on the date the claim was tendered there was a coverage obligation because they're all extrinsic and that's right on condition K of the policy saying we won't consider anything outside the four corners. So ultimately I think the coverage analysis comes down to they've retroactively canceled coverage for Dr. Geisler under this fact pattern and that is just simply unjust to allow that to happen. So for all those reasons I respectfully request that you reverse the orders of the trial court, grant summary judgment for Dr. Geisler as to the la licata and remand it for further proceedings as to damages and on the Townsley reverse because I don't think that they hit their burden for summary judgment under the totality of the circumstances. If there's no further questions I appreciate your time. Thank you.